UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

YASNERIZ MOTA,

                                        Plaintiff,                    20-CV-07294 (SN)

                -against-                                             OPINION & ORDER

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

----------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge:**

Plaintiff Yasneriz Mota seeks review of the decision of the Commissioner of Social

Security (the "Commissioner") finding that she was not disabled or entitled to supplemental

security income ("SSI") under the Social Security Act (the "Act"). The parties have cross-moved

for judgment on the pleadings. For the reasons stated below, Mota's motion is DENIED, and the

Commissioner's motion is GRANTED.

## BACKGROUND

### I.    Administrative History

Mota applied for SSI on May 24, 2017. See Administrative Record ("R.") 21, 96. She

alleged that she was disabled beginning March 6, 2016, due to degenerative disc disease of the

lumbar spine, asthma, bipolar disorder, and post-traumatic stress disorder.[1] R. 97-108. Her

application was denied, and she requested a hearing before an administrative law judge ("ALJ")

---

[1] At various stages in the application process, Mota listed depression, anxiety, schizophrenia, and diabetes as additional medical conditions limiting her ability to work. E.g., R. 238. The ALJ's decision focused on Mota's degenerative disc disease, asthma, bipolar disorder, and post-traumatic stress disorder as "severe impairments" relevant to his analysis of her disability under the Act, and Mota does not argue that the ALJ improperly rejected any impairments.

to review her case. R. 21. Mota appeared for a hearing before ALJ John Noel on June 25, 2019, and he issued a decision denying her claim on September 4, 2019. R. 21-39. On July 13, 2020, the Appeals Council denied Mota's request for review, making the ALJ's decision final. R. 1-8; see 20 C.F.R. § 416.1581; 42 U.S.C. § 405(g).

## II.     Mota's Civil Case

Mota filed her complaint on September 8, 2020, seeking review of the ALJ's decision. See ECF No. 1. She requested that the Court set aside the decision and grant her SSI or, alternatively, remand the case for further proceedings. Id. ¶ 9. The Commissioner answered by filing the administrative record, and the parties cross-moved for judgment on the pleadings. See ECF Nos. 15, 22, 26. Mota argues that the ALJ's own findings supported a decision that she is disabled and that the ALJ's decision was not supported by substantial evidence. See ECF No. 23. The Commissioner contends that the ALJ's decision was supported by substantial evidence and that Mota did not demonstrate that she is disabled. See ECF No. 27.

The Honorable John P. Cronan referred this case to my docket and the parties consented to my jurisdiction on January 15, 2021, pursuant to 28 U.S.C. § 636(c). ECF Nos. 11, 12.

## III.    Factual Background

### A.  Non-Medical Evidence

Mota was born in 1979 and was between 37 and 40 years old during the period at issue. R. 21, 206. She left the Dominican Republic when she was 14 and had completed the equivalent of ninth grade. R. 90, 294. Before she applied for SSI, she worked as a hairdresser, cutting and styling hair. R. 74-75, 228. When she worked as a hairdresser, Mota spent around 4 hours a day walking and standing, and 4 hours a day writing, typing, or handling small objects. R. 230. She applied for SSI after the onset of her conditions. R. 75, 239.

At her hearing before the ALJ, Mota testified with the assistance of an interpreter, though she answered most of the ALJ's questions before they were translated. R. 70-71, 75. She stated that she had a lot of pain in her back, and that she recently had surgery to remove a kidney stone. R. 75-76. At the time of the hearing, Mota was using a cane to walk, but had not needed one before the surgery. R. 76. She said that she had pain when she walked and could walk about two blocks before the surgery and one block after. R. 76-77.

On the day of the hearing, Mota reported that she was experiencing a "nine" in pain on a scale from zero to ten, but that before she had the surgery, she would experience a "seven" on a regular day. R. 84-85. She had problems sitting down and kneeling, and could sit for about half an hour until she felt like she needed to use the restroom. R. 77. She stated that she could not lift ten pounds because she had plates and screws in her left hand. R. 77. She also could not pick up a gallon of milk. R. 85.

Mota had trouble sleeping after her kidney surgery but had been able to sleep somewhat better before because she took Ambien and Seroquel to help her insomnia, though the medications' effect would frequently wear off in the middle of the night, causing her to wake. R. 81, 86-87. She had nightmares every two or three days, anxiety most days, anxiety attacks approximately every two weeks, and post-traumatic stress disorder ("PTSD") related to her childhood and a previous relationship. R. 86-88. Mota took Percocet for her back pain and used her asthma inhaler about every two weeks, or whenever she felt like she needed to use it. R. 85-87. She did not experience any side effects from her medications. R. 85-86.

Mota testified that she was not able to mop, dust, sweep, or do laundry because of her back pain; her husband did most of the household chores, including cooking and doing the grocery shopping. R. 78. She could not make her bed in the morning, needed help putting on her

shoes, and sometimes needed help getting in the bathtub. R. 82-83, 86. Mota typically stayed home and watched television or read. R. 79, 82-83. She did not have friends or go out with her husband. R. 82. Every three days, she walked a block to see her children, but did not do things with them outside the home. R. 80. She used public transportation to get to her doctor appointments, and always remembered to pay her monthly bills and take her medicine because she had diabetes. R. 79, 83.

Hank Lerner, a vocational expert, also testified at Mota's hearing. R. 88-94. He classified Mota's past work as a hair stylist as an exertionally light, skilled occupation. R. 89. Lerner was asked to consider two hypotheticals. R. 89. First, he was asked to consider a hypothetical person of Mota's age, education, and work experience who could perform a full range of light work but could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds, occasionally balance, stoop, kneel, crouch, and crawl, have occasional exposure to pulmonary irritants, perform simple, routine tasks, use judgment limited to simple work-related decisions, deal with routine changes in the work setting, have only occasional contact with the public, and could not work on a team with coworkers. R. 90. He testified that such a person could perform the unskilled work of production assembler, printed circuit board pre-assembler, or electrical equipment sub-assembler, of which there were 9,600, 7,000, and 9,600 jobs in the national economy, respectively. R. 91.

Second, Lerner was asked to consider a hypothetical person similar to that described above but who could not have contact with the public and was sedentary. R. 91-92. He testified that such a person could perform the unskilled work of PC board assembly touch-up screener, press clippings cutter and paster, and document preparer of microfilm with digital scanning, of which there were 1,700, 4,000, and 30,000 jobs in the national economy, respectively. R. 92.

Lerner stated that an employer would generally not tolerate an unskilled worker who was off task more than ten percent of the workday or missed more than one day of work each month. R. 92, 93. Finally, the jobs that Lerner discussed typically had 90-day probationary periods, during which most employers allow no absences. R. 94.

### B.  Treating Medical Evidence

#### 1.    Karamchand Rameshwar, MD

In 2014, Mota began biweekly individual psychotherapy and medication management with Dr. Rameshwar and other staff at Brightpoint Health Center, including Evelyn Vega, LCSW-R. R. 456-57 (earliest treatment date April 15, 2014), 468 (earliest treatment date August 14, 2014). Dr. Rameshwar and staff completed individualized action plan revision/review forms for appointments in 2016, 2017, 2018, and 2019. E.g., R. 452-54, 458-60, 462-64, 496-98, 753-55, 816-19. The July 26, 2018 form reported that Mota had not been seen for psychotherapy for about eight months but had been seeing her medication provider regularly. R. 816.

At a February 19, 2016 appointment, Mota reported that she was experiencing a depressed mood, insomnia, isolative behaviors, and panic-related symptoms. R. 462. That same day, Dr. Rameshwar and Evelyn Vega submitted a Mental Impairment Medical Source Statement. R. 468-76. According to the statement, Mota was diagnosed with Bipolar I Disorder, PTSD, anxiety, and kidney stones. Id. Her symptoms included sleep disturbance, mood disturbance, emotional lability, time or place disorientation, social withdrawal or isolation, blunt, flat or inappropriate affect, decreased energy, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, feelings of guilt or worthlessness, suicidal ideation or attempts, generalized persistent anxiety, and poor concentration. Id.

According to Vega and Dr. Rameshwar's statement, Mota's impairments were reasonably consistent with the symptoms and functional limitations described. Id. The impairments lasted or were expected to last at least twelve months and would cause Mota to be absent from work more than three times a month. Id. Mota would have difficulty working at a regular job on a sustained basis because her memory and concentration were compromised. Id. She had marked difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, and repeated (three or more) episodes of deterioration or decompensation in work or work-like settings, which caused her to withdraw from that situation or to experience exacerbation of signs and symptoms. Id. She had poor or no ability to maintain attention for two hour segments, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in the work setting, or deal with normal work stress. Id. She had poor or no ability to perform semi-skilled or skilled work. Id.

During ensuing appointments in 2016, 2017, and 2019, Mota reported that she was more able to use coping skills to manage her mood and had an improved understanding of her symptoms but continued to experience difficulty sleeping at night. She was consistent with her medication management. R. 452, 496, 534, 550, 553, 560, 567, 570, 576, 595, 608, 614, 636, 647, 663, 715, 769-70. At a July 29, 2016 appointment, she reported that she was in constant pain. R. 658.

### 2.     Patrick Tigenoah, NPP

Nurse Practitioner Tigenoah, Mota's treating psychiatric nurse practitioner, saw her at multiple appointments throughout 2016, 2017, 2018, and 2019 for medication management. See, e.g., R. 783, 786, 791, 793, 803, 846.

On June 28, 2017, Nurse Practitioner Tigenoah submitted an opinion stating that Mota had been diagnosed with PTSD, bipolar disorder, and cocaine/cannabis dependence (in remission). R. 448. He stated that Mota was unable to work due to her symptoms, which included depression, anxiety, paranoia, mood lability, irritability, anger, poor impulse control, and intermittent command auditory hallucinations to hurt herself. Id. Nurse Practitioner Tigenoah "strongly" recommended that Mota receive disability benefits because she was unable to be around other people and had severe difficulties in her relationships with others. Id.

On January 25, 2019, Nurse Practitioner Tigenoah completed a Mental Impairment Medical Source Statement based on monthly contact over four years.[2] R. 836-39. Mota's symptoms included poor memory, sleep disturbance, personality change, mood disturbance, emotional lability, loss of intellectual ability of 15 IQ points or more, recurrent panic attacks, anhedonia or pervasive loss of interests, difficulty thinking or concentrating, social withdrawal or isolation, blunt, flat, or inappropriate affect, decreased energy, manic syndrome, persistent irrational fears, and generalized persistent anxiety. Id. She experienced dizziness, drowsiness, and headache as side effects of her medication, and had poor concentration, difficulty focusing, low energy, irritability, and generalized weakness and anxiety. Id.

---

[2] Plaintiff states that the Medical Source Statement was completed by Nurse Practitioner Tigenoah and Dr. Rameshwar. The only evidence of Dr. Rameshwar's involvement is a page attached to the statement with his signature stamp. R. 840.

Nurse Practitioner Tigenoah found her impairments reasonably consistent with the symptoms and functional limitations described. Id. Her impairments would cause her to be absent from work more than three times a month. Id. Her ability to perform a number of work-related mental activity experienced extreme loss,[3] including maintaining attention and concentration for extended periods, maintaining regular attendance and punctuality, making simple work-related decisions, completing a normal workday or work week without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. Id. She also experienced marked loss[4] in being able to remember locations and work-like procedures, understand, remember, and carry out very short, simple instructions, and understand, remember, and carry out detailed instructions. Id.

### 3.    Phat Tran, MD

Mota had appointments with Dr. Tran regarding her back pain on January 13, 2016, February 10, 2016, March 9, 2016, April 6, 2016, May 18, 2016, June 30, 2016, August 12, 2016, September 23, 2016, November 4, 2016, December 23, 2016, February 3, 2017, March 28, 2017, May 9, 2017, June 26, 2017, and August 14, 2017. R. 536-39, 556-59, 563-66, 572-75, 598-601, 610-13, 621-23, 644-46, 655-57, 666-69, 678-93, 704-06. She experienced non-specific back ache with spasms but Dr. Tran noted at every appointment that she was able to sit comfortably in a chair, walk four to five blocks, use public transportation, and do normal activity. Id. During some of her 2016 visits, she rated her pain as a "10" on a scale of 1 to 10, but during her 2017 visits, she generally rated her pain between a "5" and "8" on a scale of 1 to 10.

---

[3] Extreme loss was defined as complete loss of ability in the named activity; inability to sustain performance during an 8-hour workday. R. 766.
[4] Marked loss was defined as substantial loss of ability in the named activity; ability to sustain performance only up to one third of an 8-hour workday. R. 766.

Id. Mota appeared alert and oriented and had good mobility and stable ambulation without any assistive device. Id. X-rays of her lumbar spine showed degenerative arthritis of the spine. Id.

### 4.    Pavel Alexandrov, MD

Dr. Alexandrov evaluated Mota on October 2, 2017. R. 771-72. She described pain in her lower back and left hand, and described the back pain as radiating, squeezing, stabbing, and stiff. Id. During the evaluation, Dr. Alexandrov described her as looking for a comfortable position and finding it difficult to stand, walk, or bend. Id. An exam revealed local severe spasticity (spasms), painful and limited abnormal range of motion, and local tenderness to palpation at the L3-L4, L4-L5, and L5-S1 vertebral levels. Id.

On October 10, 2017, Dr. Alexandrov administered an MRI of Mota's lumbar spine. R. 762. The MRI showed mild bulging of the L4-L5 disc that extended into the neural foramen, causing moderate bilateral neural foraminal narrowing.[5] Id. There was mild spinal canal stenosis and a left posterior annular tear of the outer layer of the disc. Id.

Dr. Alexandrov evaluated Mota again on February 8, 2019. R. 773-74. She presented with exacerbation of pain in the lower back and radiation of pain into her buttocks and legs. Id. Lying down made Mota's symptoms worse, especially at night, and significantly interfered with her daily life activities. Id. She was moderately impaired and found it difficult to bend during the evaluation. Id. She had received a medial branch nerve block injection on November 28, 2017, and April 18, 2018, a radiofrequency ablation on July 11, 2018, and steroid injections on January 23, 2018, September 6, 2018, and December 7, 2018, all to the right lumbar spine. Id.

---

[5] Foraminal narrowing is a type of spinal stenosis, a back condition that occurs when the open spaces within the spine narrow. Lite Wu & Ricardo Cruz, Lumbar Spinal Stenosis, Nat'l Ctr. for Biotechnology Info. (last updated Aug. 25, 2021), https://www.ncbi.nlm.nih.gov/books/NBK531493/.

Dr. Alexandrov submitted a Medical Source Statement on February 15, 2019. R. 777-82. He described Mota's pain as constant, throbbing stiffness, tightness, and pain in the back radiating into both buttocks and legs and tingling in the feet occurring during mornings and nights for multiple years. Id. He diagnosed her with lumbar degenerative disc disease, lumbosacral radiculitis, left shoulder degenerative joint disease, and carpal tunnel syndrome. Id. Depression and anxiety affected the severity of Mota's pain, which was frequently severe enough to interfere with her attention and concentration. Id. Dr. Alexandrov described Mota as severely limited in the ability to deal with work stress, able to sit continuously in a working position or stand or walk about continuously for a maximum of 15 minutes, and able to sit, stand, or walk for a cumulative one hour during an eight-hour workday. Id. Mota required a morning break, lunch break, and afternoon break, as well as additional rest during an eight-hour workday. Id. She could frequently carry one to five pounds but never more than five pounds, frequently balance when standing or walking on level terrain, never stoop, occasionally reach with her right hand and never with her left, and frequently handle with her right hand and occasionally with her left. Id. A hand-held assistive device was medically required to aid her in walking and standing, but Dr. Alexandrov did not indicate what kind. Id. Due to her impairments, Mota was likely to be absent from work more than three times a month. Id.

### C.  Non-Examining Agency Reviewer E. Kamin, PhD

On July 18, 2017, Dr. E. Kamin submitted a Medical Determinable Impairments and Severity Form after reviewing Mota's medical records. R. 100-08. He stated that Mota's impairments (diabetes; asthma; depressive, bipolar, and related disorders; and osteoarthrosis and allied disorders) were severe but found that the Paragraph "B" criteria for depressive, bipolar, and related disorders were not met. Id. Based on her daily activities, the location, duration,

frequency, and intensity of her pain and other symptoms, medication treatment, treatment other than medication, precipitating and aggravating factors, and longitudinal treatment records, Dr. Kamin found that Mota's statements about the intensity, persistence, and functionally limiting effects of her symptoms were not substantiated by the objective medical evidence alone. Id. Her symptoms were consistent with the medical evidence of record, but not to the degree alleged. Id. Dr. Kamin noted that there was "no indication" of a medical opinion from any medical source. Id.

Dr. Kamin determined that Mota could occasionally carry 20 pounds, frequently carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday. Id. She could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, and occasionally balance, stoop, kneel, or crouch. Id. Her ability to carry out short and simple or detailed instructions, to make simple work-related decisions, sustain an ordinary routine without special supervision, maintain socially appropriate behavior, and use public transportation was not significantly limited. Id. Mota had moderate limitations in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual, work in coordination with or in proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Id. Dr. Kamin determined Mota was not disabled and recommended unskilled, sedentary work. Id.

## IV.     The ALJ's Decision

On September 4, 2019, the ALJ denied Mota's SSI application. R. 21-39. The ALJ

identified the administrative and procedural history, the applicable law, and his findings of fact

and conclusions of law. Id.

At step one, he determined that Mota had not engaged in any substantial gainful activity

since May 24, 2017. R. 23. At step two, he found that Mota's degenerative disc disease of the

lumbar spine, asthma, bipolar disorder, and PTSD qualified as severe impairments. Id. At step

three, he determined that her impairments did not equal the severity of any one of the listed

disabilities ("Listings") in the applicable regulations. R. 24-26; see 20 C.F.R. Pts. 416.920(d),

416.925, 416.926.

First, the ALJ found that the requirements of Listing 1.04A, B, or C (disorders of the

spine) were not met or medically equaled. Mota was "able to ambulate effectively without using

an assisting device such as a cane or walker" and therefore had not experienced loss of function

due to her degenerative disc disease. R. 24; 20 C.F.R. Part 404, Subpart P, App'x 1, §§

1.00(B)(2)(a), (B)(2)(b)(1). Second, the ALJ found that Mota's mental impairments did not meet

or medically equal the criteria of Listings 12.04 (depressive, bipolar, and related disorders) or

12.06 (anxiety and obsessive-compulsive disorders), or any other section listed in Regulation No.

4, Subpart P, Appendix 1. The preponderance of the evidence did not support finding that Mota's

mental impairments resulted in at least one extreme or two marked limitations sufficient to

satisfy the "Paragraph B" criteria of Listings 12.04 or 12.06. R. 25. The ALJ did not consider

with specificity Listing 12.15 (trauma- and stressor-related disorders, including PTSD).

At step four, the ALJ established Mota's residual functional capacity ("RFC"). R. 26-27.

He found that she had the RFC to perform light work, as defined in 20 C.F.R. § 416.967(b),

could occasionally climb ramps and stairs, occasionally climb ladders, ropes, or scaffolds, and occasionally balance, stop, kneel, crouch, and crawl. Id. Mota could tolerate occasional exposure to odors, dust, fumes, and other pulmonary irritants. Id. She could perform simple and routine tasks, use judgment limited to making simple work-related decisions, and handle routine changes in the work setting. Id. Finally, Mota could tolerate occasional contact with the public but was precluded from working on a team with coworkers. Id. Given Mota's RFC, the ALJ determined that Mota could not perform any past relevant work. R. 33.

At step five, the ALJ concluded that there were jobs existing in "significant numbers" in the national economy for Mota to perform. R. 33. This was based upon an evaluation of her age, education, work experience, RFC, and the testimony of the vocational expert, Lerner. Thus, because the ALJ found that Mota was able to engage in substantially gainful activity, he concluded that she had not been disabled through the applicable period and was not entitled to benefits. R. 35.

## V.    The Appeals Council's Determination

Following the ALJ's unfavorable decision, Mota requested that the Appeals Council review the decision. See R. 9-14. On July 13, 2020, the Appeals Council denied her request for review, making the ALJ's decision final. R. 1.

### DISCUSSION

## I.    Standard of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). An ALJ's determination may be set aside only if it is based upon legal error or it is not supported by

substantial evidence. <u>Rosa v. Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999) (quoting <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998)).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). The Commissioner's findings as to any fact supported by substantial evidence are conclusive. <u>Diaz v. Shalala</u>, 59 F.3d 307, 312 (2d Cir. 1995); <u>see also</u> <u>Alston v. Sullivan</u>, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). Therefore, if sufficient evidence supports the ALJ's final decision, the Court must grant judgment in favor of the Commissioner, even if substantial evidence also supports the plaintiff's position. <u>See</u> <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" (emphasis in original) (citations and internal quotation marks omitted)). Although deferential to an ALJ's findings, a disability determination must be reversed or remanded if it contains legal error or is not supported by "substantial evidence." <u>See</u> <u>Rosa</u>, 168 F.3d at 77.

## II.   Definition of Disability

A claimant is disabled under the Act if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." Id. § 1382c(a)(3)(D). A claimant will be found to

be disabled only if her "impairments are of such severity that [she] is not only unable to do [her]

previous work but cannot, considering [her] age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy . . . ." Id. §

1382c(a)(3)(B).

An ALJ must proceed through a five-step process to make a disability determination. See

20 C.F.R. § 416.920. The steps are followed in order; if it is determined that the claimant is or is

not disabled at a step of the evaluation process, the evaluation will not progress to the next

step. See id. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in
> substantial gainful activity. Where the claimant is not, the Commissioner next
> considers whether the claimant has a "severe impairment" that significantly limits
> her physical or mental ability to do basic work activities. If the claimant suffers
> such an impairment, the third inquiry is whether, based solely on medical evidence,
> the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app.
> 1. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry
> is whether, despite the claimant's severe impairment, she has the residual functional
> capacity to perform her past work. Finally, if the claimant is unable to perform her
> past work, the burden then shifts to the Commissioner to determine whether there
> is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d

770, 774 (2d Cir. 1999)).

A claimant bears the burden of proof as to steps one, two, three, and four; the

Commissioner bears the burden as to step five. Selian v. Astrue, 708 F.3d 409, 418 (2d Cir.

2013) (citation omitted).

## III.    The ALJ's Application of the Five-Step Analysis

Mota argues that portions of the ALJ's decision are not supported by substantial

evidence, and that the ALJ committed legal error. Specifically, Mota contends that, in

determining her RFC, the ALJ did not properly consider her treating psychiatrist's and physician's assessments and did not properly incorporate the work-related limitations that the ALJ identified. Additionally, Mota contends that, although the ALJ found Dr. Kamin's opinion persuasive, the ALJ did not adopt all of Dr. Kamin's opinion in determining her RFC, and failed to consider the effect of total monthly absences on Mota's ability to maintain fulltime work. At step five, Mota argues that the ALJ erred in accepting the vocational expert's testimony and in failing to include Mota's inability to communicate in English and her obesity in the hypotheticals he posed to the vocational expert.

### A.  The ALJ's Determination of Mota's RFC

Based on all of the relevant medical and other evidence available, including Mota's own descriptions and observations, the ALJ found that Mota had the RFC to perform light work with certain postural, environmental, and mental work-related limitations described above. R. 26-27; see 20 C.F.R. §§ 416.920(a)(4)(iv), 416.945(a)(3). Mota had the burden of proving that she did not have the RFC to perform any substantial gainful activity. See 20 C.F.R. §§ 416.912(a), 416.945(a)(3).

In assessing Mota's RFC, the ALJ considered the medical and other evidence available to him. Because Mota's SSI application was filed after March 27, 2017, revised regulations guided his analysis. See 20 C.F.R. § 416.920c. When considering medical opinions and prior administrative medical findings under these new regulations, the ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight" to any of those opinions.[6] Id. § 416.920c(a). Instead, the ALJ evaluates the persuasiveness of an opinion provided by medical

---

[6] The new regulations also differ from the previous rules in that "acceptable medical sources" now include licensed advanced practice registered nurses such as Nurse Practitioner Tigenoah. 20 C.F.R. § 416.902(a)(7).

sources based on the opinion's "supportability," its "consistency," the "relationship" of the medical source and the claimant, the source's "specialization," and "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." Id. § 416.920c(1)-(5). The most important factors are supportability and consistency; "the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support" their opinion, and the more consistent a medical opinion or prior administrative medical finding is with "the evidence from other medical sources and nonmedical sources" in the claim, the more persuasive the opinion or finding. Id. § 416.920c(b)(2), (c)(1), (c)(2). The ALJ must address how he considered the supportability and consistency factors but need not discuss the other three. Id. § 416.920c(b)(2). However, where the ALJ finds two or more divergent medical opinions to be equally well-supported and consistent with the record, the ALJ must articulate how he evaluated the three remaining factors. Id. § 416.920c(b)(3).

Here, the ALJ considered the two medical opinions by Nurse Practitioner Tigenoah, the opinion by Vega and Dr. Rameshwar, the opinion by Dr. Alexandrov, and the opinion by Dr. Kamin. Mota challenges the ALJ's consideration of the opinions of Nurse Practitioner Tigenoah, Vega and Dr. Rameshwar, and Dr. Alexandrov.

The ALJ properly found Nurse Practitioner Tigenoah's opinions unsupported by and inconsistent with the other medical and non-medical evidence in the record. As discussed above, the notes for Mota's mental health-related appointments with Nurse Practitioner Tigenoah and other staff at Brightpoint Health Center reflect broadly benign examination results, e.g., R. 414, 551, 554, 561, 568, 786-87, 791-92, 803-04, though Mota's affect and mood were sometimes assessed as "depressed/irritable" or "neutral/euthymic," e.g., R. 414, 551, and Mota went to the emergency department in 2015 due to auditory hallucinations and suicidal ideation, R. 322-23.

17

Some medical personnel examining her have generally found her alert, fully oriented, and with good concentration and short-term recall, R. 393-94, while others have found her uncooperative, anxious, angry and irritable, with "fair" impulse control, R. 399. It is clear that Mota sometimes experienced mental health-related symptoms, but not on an ongoing or regular basis.

Such evidence is not consistent with or supportive of Nurse Practitioner Tigenoah's opinion in 2017 that Mota was unable to work due to depression, anxiety, paranoia, mood lability, irritability, anger, poor impulse control, and intermittent command auditory hallucinations to hurt herself. It is also not consistent with or supportive of his opinion in 2019 that Mota was experiencing poor memory, sleep disturbance, personality change, mood disturbance, emotional lability, loss of intellectual ability of 15 IQ points or more, recurrent panic attacks, anhedonia or pervasive loss of interests, difficulty thinking or concentrating, social withdrawal or isolation, blunt, flat, or inappropriate affect, decreased energy, manic syndrome, persistent irrational fears, and generalized persistent anxiety, and that all of these symptoms caused her ability to perform work-related mental activity to experience extreme loss. On the contrary, the healthcare providers who examined Mota over the course of 2016 to 2018 recorded generally benign examination results. Mota was cooperative with her medication regimen and generally presented as alert and with good intellectual function. The ALJ properly reasoned that Nurse Practitioner Tigenoah's medical opinions were not supported by Mota's examination results.[7]

For similar reasons, the ALJ properly found Vega and Dr. Rameshwar's medical opinion unsupported by and inconsistent with the other medical and non-medical evidence in the record.

---

[7] The ALJ's failure to note that Nurse Practitioner Tigenoah's 2019 assessment was co-signed by Dr. Rameshwar does not change my analysis. The ALJ did not claim that Nurse Practitioner Tigenoah was not an acceptable medical source, and the new regulations specifically include licensed nurse practitioners as medical sources. See 20 C.F.R. § 416.902(a)(7).

The Court is not convinced that the opinion's checklist format rendered it inherently unconvincing, but the ALJ correctly noted that the opinion largely failed to cite specific clinical findings or medical treatment notes to support its conclusions. R. 468-76. Additionally, as described previously, the medical and non-medical evidence in the record is not consistent with or supportive of Vega and Dr. Rameshwar's opinion that Mota had marked difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner, and repeated (three or more) episodes of deterioration or decompensation in work or work-like settings. See, e.g., R. 406, 846-47, 990.

The ALJ also properly found Dr. Alexandrov's opinion unsupported by and inconsistent with the medical and non-medical evidence in the record. In addition to her examinations by other medical staff, Mota saw Dr. Tran for her back pain on multiple occasions over a year and a half before being examined by Dr. Alexandrov. At every appointment, Dr. Tran noted that she was able to sit comfortably in a chair, walk four to five blocks, use public transportation, and do normal activity. R. 536-39, 556-59, 563-66, 572-75, 598-601, 610-13, 621, 644-46, 655-57, 666-69, 678-93, 704-06. Dr. Tran's examination notes and other examination results do not support Dr. Alexandrov's conclusions. See, e.g., R. 331-32 (noting "back pain" but full range of motion and no difficulty walking), 406 (lumbar tenderness, some mild pain with flexion, no pain with extension, and good rotation), 1137-38 (normal musculoskeletal exam). Similarly, the MRI scan report revealed only "mild bulging" of the L3-L4 and L4-L5 discs, with mild stenosis of the latter. R. 762. This objective medical evidence also does not support Dr. Alexandrov's opinion. Finally, Dr. Alexandrov's statement that Mota required an assistive device for walking and standing is also not supported by the evidence in the record; Dr. Tran and other examining medical staff found that Mota could walk without assistance. At the hearing, Mota testified that

she was using a cane because she had just undergone kidney stone surgery, but that she had not needed a cane before the surgery. R. 76.

I conclude that the ALJ properly considered the opinions of Nurse Practitioner Tigenoah, Vega and Dr. Rameshwar, and Dr. Alexandrov in his analysis.

Mota also argues that the ALJ's RFC analysis did not address whether her work-related limitations were consistent with the moderate limitations in concentration, persistence, and pace that he found. She further alleges that the ALJ inexplicitly failed to adopt all of Dr. Kamin's findings (which she says would have supported a finding of disability) and failed to consider the number of monthly absences that Mota would have as a result of her impairments and limitations.

I find first that the ALJ's RFC analysis properly addressed the consistency of Mota's work-related limitations with the mental functioning limitations that he identified. As required by the regulations, the ALJ considered Mota's statements about her symptoms and descriptions provided by her medical sources. See 20 C.F.R. § 416.929(a). However, subjective symptoms are not enough; there must be "objective medical evidence" from an acceptable medical source" that, "when considered with all of the other evidence . . . would lead to a conclusion" that a claimant is disabled. Id. Symptoms will not be found to affect a claimant's ability to do basic work activities unless medical signs or laboratory findings "show the existence of a medical impairment[] . . . which could reasonably be expected to produce" the symptoms alleged. Id. § 416.929(b); see SSR 16-3p, 2017 WL 5180304 (S.S.A. Oct. 25, 2017). If a claimant's symptoms suggest a greater restriction of function than the available objective medical evidence can establish, other evidence may be considered, including statements from the claimant, the

claimant's daily activities, the duration and frequency of the pain or symptoms, medication, and other treatment. 20 C.F.R. § 416.929(c)(3); SSR 16-3p.

The ALJ carefully considered the medical record as a whole in determining that the overall evidence of record "does not support [Mota's] testimony regarding having such severe functional limitations," R. 28, and "partially supports" her statements about having "such severe symptoms," R. 29. This conclusion was based on a review of Mota's physical and mental status exam results, x-rays and other imaging, and other medical treatment notes. The "generally benign" records supported the ALJ's finding that "while [Mota] has some mental functional limitations, she retains the capacity to perform simple tasks." R. 30. The ALJ cited specific medical evidence to support his analysis, for example, a 2017 psychiatric assessment according to which Mota was able to perform her daily activities and denied having problems with her concentration, even though she reported feeling depressed and anxious. R. 396. A number of other examination reports in the record contain similarly benign findings regarding Mota's physical and mental condition. See, e.g., R. 561, 565, 567-68, 791-92, 846-47 (discussing Mota's mental status), 406, 538, 771 (discussing her physical status). Only Dr. Alexandrov reported that she had trouble bending. R. 773.

Substantial evidence supports the ALJ's conclusion about Mota's work-related limitations, which was consistent with the functioning limitations that he identified. See Whipple v. Astrue, 479 F. App'x 367, 370-71 (2d Cir. 2012) (affirming denial of disability benefits; ALJ's RFC determination for claimant with mental health impairments was supported by substantial evidence and properly applied standard in finding that claimant's reported symptoms were not as limiting as he claimed in light of conflicting evidence from treating physicians); Gates v. Astrue, 338 F. App'x 46, 48 (2d Cir. 2009) (ALJ's determination that the claimant was

able to perform work with certain limitations was supported by mental health progress notes, assessments stating that the claimant could perform simple tasks, and the claimant's past job experience; ALJ's reasoning was "clearly discernible"); Knief v. Comm'r of Soc. Sec., No. 20-cv-6242 (PED), 2021 WL 5449728, at *6-9 (S.D.N.Y. Nov. 22, 2021) (claimant alleged disabling mental impairments including depression, anxiety, and possible PTSD and exhibited, among other symptoms, difficulty adapting and maintaining composure and limitations in concentrating, accepting instructions, and interacting with others; ALJ properly applied new regulations in finding that claimant was not disabled and could perform simple work activities in low stress environment with only occasional interaction with others; granting Commissioner's motion for summary judgment).

The Court does not follow Mota's logic that the ALJ should have found her unable to work because he found Dr. Kamin's assessment of Mota's functional limitations persuasive. The ALJ agreed with Dr. Kamin that Mota had mild to moderate mental functional limitations related to her ability to work and agreed with Dr. Kamin that she could perform simple tasks. The moderate limitations Dr. Kamin identified do not necessitate a conclusion that Mota would be absent more than once a month and/or off-task more than 10% of the time, and therefore unable to perform full-time work according to the vocational expert's testimony. The ALJ appropriately relied on Dr. Kamin's assessment in support of his conclusion; Mota offers no support for her claim that a person with the limitations that Dr. Kamin identified "should" be found disabled and unable to maintain full-time employment.

Finally, I find no issue with the ALJ's consideration of Mota's potential monthly absences from work in determining her RFC. The two medical opinions that concluded that Mota would be absent more than once a month, by Dr. Rameshwar and Dr. Alexandrov, were properly

found to be unpersuasive to the ALJ. Cf. Gallagher v. Astrue, No. 10-cv-8338 (LTS)(AJP), 2012 WL 987505, at *9, *11, *22 (Mar. 22, 2012), adopted by 2012 WL 1339357 (S.D.N.Y. Apr. 17, 2012) (ALJ's failure to address vocational expert testimony that there would be no jobs for someone absent three days a month was not harmless in part because ALJ's conclusion relied on medical opinion that agreed with vocational expert testimony); Narvaez v. Comm'r of Soc. Sec. Admin., No. 18-cv-01130 (SDA), 2019 WL 4386030, at *11-12 (S.D.N.Y. Sept. 13, 2019)) (ALJ's failure to provide reason for rejecting vocational expert testimony and medical opinion about effect of absences on ability to work was error where record included no evidence contradicting treating physician's opinion). At the hearing, the ALJ asked the vocational expert a hypothetical about the effect that missing more than one day of work a month would have on employment. R. 93. There is sufficient evidence in the record to support a finding that Mota would not miss more than one day per month due to her symptoms; for instance, a 2018 summary of progress stated that Mota had not attended psychotherapy in eight months and felt that her depression and anxiety were under control, and that her appointment frequency would be "monthly" moving forward. R. 816. Similarly, a 2019 summary of a 15-minute medication management appointment noted that the follow-up appointment was scheduled to take place in four weeks. R. 846-47.

Even if the ALJ failed to address the vocational expert's testimony explicitly in his opinion, substantial evidence in the record supports the conclusion that Mota would not miss more than one day per month because of her symptoms and would therefore be able to work.

## B.  The ALJ's Step Five Determination

At step five, Mota argues that the ALJ erred in accepting the vocational expert's testimony and in failing to include Mota's inability to communicate in English and her obesity in the hypotheticals he posed to the vocational expert.

First, the ALJ properly accepted the vocational expert's testimony that there were jobs existing in significant numbers in the national economy that Mota could perform. 4,000 to 5,000 jobs nationally may not be a significant number, see Hamilton v. Comm'r of Soc. Sec., 105 F. Supp. 3d 223, 231 (N.D.N.Y. 2015), but the vocational expert testified that a person of Mota's age, education, work experience, and RFC could perform the work of production assembler (9,600 jobs in the national economy) or electrical equipment sub-assembler (also 9,600 jobs), R. 91. Alternatively, someone in Mota's position who could not have contact with the public and was sedentary could perform the work of document preparer of microfilm with digital scanning (30,000 jobs in the national economy). R. 92. If 10,000 jobs is considered a significant number, it strains credulity to suggest that 9,600 jobs is not.

Second, the ALJ did not err in finding that Mota was able to communicate in English. While Mota testified with the assistance of an interpreter, she answered most of the ALJ's questions before they were translated and told the ALJ that she understood and could speak English. R. 74-75. Mota points to a Disability Report Form stating that she did not speak, read, write, or understand English, R. 237-45, but it is unclear who filled out the form, and the evidence in the record does not otherwise support her claim. Given Mota's testimony and response when the ALJ asked whether she understood English, the ALJ's finding that she was able to communicate in English is supported by substantial evidence.

Third, just because the ALJ did not explicitly include Mota's BMI in his questioning of the vocational expert or in his ensuing opinion does not mean he did not consider her weight. "That a particular factor or evidentiary item is not *mentioned* does not necessarily mean it was not *considered*." Younes v. Colvin, No. 14-cv-170 (DNH)(ESH), 2015 WL 1524417, at *4 (N.D.N.Y. Apr. 2, 2015) (emphasis in original). His RFC finding and questioning both contained "obesity-related limitations (*e.g.*, nonexertional postural limitations relating to climbing, bending, stooping, etc.)." Id. at *3; see R. 90.

More generally, "obesity is not in and of itself a disability," and "an ALJ's failure to explicitly address a claimant's obesity does not warrant remand." Guadalupe v. Barnhart, No. 04-cv-7644 (HB), 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citations omitted). "[W]here the record contains evidence indicating limitation of function due to obesity, the ALJ must consider the effect of obesity on the claimant's ability to do basic work activities." Battle v. Colvin, No. 13-cv-547 (JTC), 2014 WL 5089502, at *5 (W.D.N.Y. Oct. 9, 2014) (citation omitted). "'Conversely, the ALJ's obligation to discuss a claimant's obesity alone, or in combination with other impairments, diminishes where evidence in the record indicates the claimant's treating or examining sources did not consider obesity as a significant factor in relation to the claimant's ability to perform work related activities.'" Id. (quoting Farnham v. Astrue, 832 F. Supp. 2d 243, 261 (W.D.N.Y. 2011)) (citing cases); accord Browne v. Comm'r of Soc. Sec., 131 F. Supp. 3d 89, 102 (S.D.N.Y. 2015); Cahill v. Colvin, No. 12-cv-9445 (PAE)(MHD), 2014 WL 7392895, at *27 (S.D.N.Y. Dec. 29, 2014). While multiple exam reports note that Mota's BMI was over the obesity threshold of 30.00, see, e.g., R. 795, 849, there is no evidence in the record that she was diagnosed with obesity or that any of her

providers considered her weight a significant factor in relation to her ability to perform work-related activities, even Dr. Alexandrov, who assessed her lumbar spine specifically.

In sum, the ALJ's step five determination is supported by substantial evidence and free of legal error.

## CONCLUSION

Mota's motion is DENIED, and the Commissioner's motion is GRANTED. The action is DISMISSED with prejudice. The Clerk of Court is respectfully requested to terminate the motions at ECF Nos. 22 and 26.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:     February 15, 2022
           New York, New York